**REPUBLIC INSURANCE COMPANY, a Texas corporation, Plaintiff,**

v.

**Ina PIPER, Frank Piper, Krystal Ervin, Marylyn Ervin and William Ervin, Defendants.**

Civ. A. No. 80–W–4.

United States District Court, D. Colorado.

July 1, 1981.

White & Steele by Walter A. Steele and Michael L. O'Donnell, Denver, Colo., for plaintiff.

Robert M. Vockrodt, Aurora, Colo., for defendants Piper.

Robert G. Cale and Bradford Pelton, Colorado Springs, Colo., for defendants Ervin.

## MEMORANDUM OPINION

WINNER, Chief Judge.

This memorandum opinion is intended to constitute the findings of fact and conclusions of law required by Rule 52. The case is a declaratory judgment action in which diversity jurisdiction is admitted. Plaintiff asks a determination as to whether a homeowners insurance policy issued by it to Ina and Frank Piper affords coverage for injuries suffered by Krystal Ervin, a minor child of Marylyn and William Ervin. The policy in question is a typical homeowners policy, and it excludes coverage of injuries:—

"... intended by the insured (or)

"... arising out of the business pursuits of any insured. This exclusion does not apply to (1) activities which are ordinarily incident to non-business pursuits."

Plaintiff says that the injuries are not covered because they were intended by Ina Piper and because they arose out of the conduct of a business by her. Additionally, plaintiff says that the injuries did not result from activities which are "ordinarily incident to non-business pursuits."

Krystal Ervin is a beautiful, alert, well-mannered child who on December 5, 1978, when she was a little over a year old, suffered tragic burns of both her hands and who has been required to undergo surgery to try to repair the serious damage she sustained. Her hands were burned while she was under the care of and was in the home of Ina Piper, and they were burned when her hands were immersed in water later tested at a temperature of over 140°F. A lawsuit has been filed in state court on Krystal's behalf by her parents. That complaint alleges negligent supervision of Krystal while she was under the care of defendant Ina Piper, and damages of more than $1,000,000 for permanent disability are requested as are punitive damages. Republic Insurance Company is defending the state court case under a reservation of rights pending the outcome of this case.

The Child Care Act of the State of Colorado requires that all day care and foster homes be licensed. Ina Piper and Frank Piper applied for a day care license on March 1, 1978, and the license issued as of April 24, 1978. Its issuance followed an investigation by the Department of Social Services and the Department licensed the operation of a Family Care or Day Care home at the Piper's residence in Thornton, Colorado. During the investigation, representatives of the Department of Social Services talked to Mrs. Piper and explained all of the requirements for the operation of such homes. Mrs. Riley, a Department representative, told Mrs. Piper that she would be conducting a business and that ordinarily homeowners insurance policies do not cover day care homes. She told Mrs. Piper that a voluntary association of licensed day care home operators had arranged for a group

policy, and it was explained how contact could be made with that association. Mrs. Piper attended an orientation meeting put on by the association at which it was again emphasized that homeowners policies don't cover day care homes and it was again mentioned that the association had available a group policy which would be much cheaper than an individual rider on a homeowners policy assuming such a rider could be obtained. Mrs. Piper joined the association, and during the year newsletters were mailed to all members. Some of these newsletters reminded the recipients of the need for insurance and of the fact that homeowners policies don't usually cover injuries sustained by children in the care of a licensed day care home. Mr. Piper did not attend the orientation meeting, but he is a former insurance salesman who had been employed by a general line insurance company, and he had himself sold homeowners policies. Nevertheless, the Pipers did not elect to obtain coverage under the association group policy nor did they attempt to obtain a rider to their homeowners policy. Accordingly, if Krystal Ervin is to be compensated for her injuries from any known insurance coverage, she must be paid from the Pipers' homeowners policy.

Plaintiff's officers and lawyers cannot be governed by sympathy any more than can a judge or jury, and they owe the duty to their stockholders to question whether there is coverage to pay for Krystal's injuries under the language of the policy. That is one reason they filed this lawsuit, and another reason is that insurance premiums are based on actuarial evaluations of covered risks, and if they were to be sympathetic extensions of the evaluated risks, all insureds would be prejudiced.

Of course, Krystal can't tell us what happened, nor can any of the other children being cared for by Mrs. Piper that day because all of them were too young. Mrs. Piper's separate stories to the criminal investigator who looked into the case were not consistent, but seemingly, after being given a mid-morning snack, the children [two of whom were Mrs. Piper's children] were supposed to go to the bathroom to wash their hands. It was there that Krystal's hands were so severely burned. Mrs. Piper says that Krystal crawled up on a hamper and somehow stopped the flow of water from the sink in which she had voluntarily placed her hands. According to Mrs. Piper, when she came into the bathroom, Krystal's hands weren't red or swollen, and she wasn't crying. Mrs. Piper says that the telephone rang about that time and when she finished her telephone conversation, Krystal's hands were red and she was whimpering. She called the parents, and Mr. Ervin picked up the child and took her to the medical clinic where Krystal's pediatrician practiced. Mrs. Piper testified that she found the child to be somewhat retarded and she postulated that Krystal is insensitive to pain. This story differed in part from that which was told the police officer during the child abuse criminal investigation.

■ Any suggestion that the burns resulted from momentary inadvertent placing of the child's hands in hot water was destroyed by the testimony of Dr. Boshen, the pediatrician. He said that although understandably enough no one has experimented with putting small childrens' hands in scalding water, based upon his training and experience, it was his opinion that if a child mistakenly put her hands in water of 140°F., the hands wouldn't remain there more than two tenths of a second; that the burns Krystal sustained meant that her hands were in the water at least three seconds and perhaps six seconds. Additionally, although there was not a scintilla of credible evidence that the child is insensitive to pain or that she is in any way retarded or slow witted, Dr. Boshen testified that he had performed all customary neurological tests on her, and that she is an intelligent, normal little girl. He, and other witnesses, testified that when she was taken from the Piper home to the clinic, in addition to the burns on her hands and wrists, she had somehow received a bruise on her nose which was belatedly said by Mrs. Piper to have resulted from a fall. The nature and location of the burns were

such that, according to the doctor, it is highly unlikely that they were accidental, and I find from a preponderance of all the evidence that the burns were the result of an intentional act. The only person present in the home physically capable of that act was Mrs. Piper.

■ I come now to the question of whether these injuries arose out of a business pursuit of the insured and, if so, whether they arose out of activities which are ordinarily incident to non-business pursuits. Counsel have found and I have found surprisingly few cases discussing whether day care homes are or are not encompassed within the standard business pursuits clause of homeowners insurance policies, and it is arguable that there is conflict among those decisions, although it is also arguable that the cases differ in result because of different facts. At the outset, I mention that although its draftsmanship may be open to criticism, I do not think that the policy is ambiguous, and I think it can and must be read to mean just exactly what it says. *Security Mutual Casualty Co. v. Century Casualty Co.* (1976) 10 Cir., 531 F.2d 974; *Resort Rental Car System, Inc. v. Chuck Ruwart Chevrolet, Inc.* (1975) 519 F.2d 317, *Quad Const., Inc. v. Wm. A. Smith Contracting Co., Inc.* (1976) 10 Cir., 534 F.2d 1391, and *Griffin v. United Bank of Denver* (1979) Colo., 599 P.2d 866.[1]

The contract says that subject to the exception which I shall discuss presently, accidents arising out of business pursuits are not covered by the policy. There is more than just a little bit of evidence to show that Mrs. Piper was in the day care center business. She was told at the time of the interview by the Social Services representatives that day care homes were businesses. She was told this at the time of the orientation meeting. She filed a formal application with the State of Colorado for a license to operate a day care home. She received a license from the Department of Social Services of the State of Colorado to operate a day care home pursuant to the rules and regulations of the Department, and she was told that the license couldn't be transferred and that her records had to be open to inspection at all time.s She obtained formal records concerning each child under her care, including Krystal. Most importantly, the fact that she was operating a business is shown by her income tax return, and, as of the time the return was filed, she had finished educational courses taken to qualify her to serve as a tax return preparer. Her 1978 tax return has attached to it a Schedule C entitled Profit or (loss) from business or profession, and she described that business as "babysitting." She was able to come up with a loss by claiming as a business expense $777 in "rent on business property", plus expenses for telephone, depreciation, license fee and the expenses of food furnished the children. Of course, for tax purposes, it was in Mrs. Piper's best interest to say that she was engaged in business while now she would like to take the position that she wasn't. However, in my judgment, she was, and I find that she was engaged in business in the operation of the licensed day care home.

■ That brings me, then, to the question of whether the accident resulted from "activities which are ordinarily incident to non-business pursuits." It seems to me and I find that nothing could be more a part of the business of operating a day care home than supervision of the children under the licensee's care, and it was while supervising the child that the tort occurred. *Crane v. State Farm and Casualty Company and Gulf Insurance Co. v. Tilley*, both *supra*, reach a contrary result on different facts. They are effectively distinguished in *Stanley v. American Fire and Casualty Co., supra*, and I agree with that case. The facts of *Stanley* were that Mrs. Stanley watched over children in her home and that she was

---

1. I am aware of cases which say that similar policies are ambiguous, but I disagree with them. Moreover, here the insured was adequately advised that the policy didn't cover. See, *Crane v. State Farm and Casualty Company* (1971) 5 Cal.3d 112, 95 Cal.Rptr. 513, 485 P.2d 1129, *Stanley v. American Fire and Casualty Co.* (1978) Ala., 361 So.2d 1030, and *Gulf Insurance Co. v. Tilley* (1967) D.C.Ind., 280 F.Supp. 60.

compensated for her services. A small child fell into a fireplace and was burned. The Court first discussed *Gulf Ins. Co. v. Tilley,* D.C.Ind., 280 F.Supp. 60, and said as to it:

"In Tilley, the exclusionary clause was held inoperative where baby care was furnished for consideration, and the baby sustained burns when she overturned a coffee percolator. The district trial court assumed that the child care was a business pursuit, but characterized insured's coffee brewing for herself and a guest as an activity not connected with baby care, thus ordinarily incident to non-business pursuits. This analysis is questionable. The baby was burned because of the condition on the premises, and the baby's own activity. The business of child care contemplates the exercising of due care to safeguard a child of tender years from household conditions and activities; and, any activity of the insured in this regard from which injury results cannot logically be called an activity ordinarily incidental to a non-business pursuit. In other words, the activity referred to is a failure to supervise rather than making coffee for a third party. Undertaking the business relation of child care for compensation is certainly not ordinarily incident to the conduct of a household.

The Alabama Court's analysis of *Crane v. State Farm Ins. Co.,* 5 Cal.3d 112, 95 Cal. Rptr. 513, 485 P.2d 1129, can be summarized:

"In Crane the Supreme Court of California reasoned that 'indeed, it is difficult to conceive of an activity more ordinarily incident to a noncommercial pursuit than home care of children.' We agree with the general ascertain, (sic) but disagree with the conclusion that child care for pay is ordinarily a non-business pursuit. It should be remembered that we are not here dealing with a temporary or casual keeping of children, but rather with a more permanent arrangement for an agreed upon compensation. The Supreme Court of California in Crane reversed the Court of Appeals. The Court of Appeals' decision is styled the same and appears in 14 Cal.App.3d 727, 92 Cal.

Rptr. 621. It is our view that the Court of Appeals' decision is better reasoned and more properly analyzes the other cases cited than does the opinion of the Supreme Court of California."

*Stanley v. American Fire and Casualty Co. supra,* concludes:

"We are in accord with the several authorities that the exclusionary provision is poorly worded and could have been written with more specificity. Yet when applied to these facts we do not find it ambiguous.

"Two questions become pertinent. First, did the injury arise out of a business pursuit? We hold that it did. Second, did the injury arise out of an activity which is ordinarily incident to a non-business pursuit? The activity referred to is not preparing lunch, which would ordinarily be incident to a non-business pursuit, but rather to the failure to properly supervise a young child. Supervising children on a regular basis for compensation is ordinarily a business pursuit.

"We are therefore of the opinion that the business exclusion is applicable and the judgment of the trial court is correct.

"The judgment is affirmed."

In saying that I agree with *Stanley,* I do not wish to be understood to be saying that I think that either the Indiana court or the California court would hold that there is coverage here. The facts in this case are much stronger in favor of the company than are the facts in either *Tilley* or *Crane.* Neither of those cases has facts even approaching the facts of this case demonstrating that there was a business being conducted. Neither of those cases considered a licensing procedure; neither considered express explanations that there was no insurance coverage and, most importantly, neither had to do with a Schedule C on an income tax return. I think that if the facts of this case had been before either the Indiana or the California court, a business enterprise and pursuit would have been found. Moreover, although it is open to argument whether making a cup of coffee

for the adult in charge of a child is separate and apart from the business and is part of "activities which are ordinarily incident to non-business pursuits", I think that there is no argument that having children wash their hands after being given a snack is part of supervising a child. *Crane*, at best, holds that improper maintenance of premises wasn't negligent supervision, and it doesn't go so far as to say that where there is negligent or intentional injury resulting from the actual care of a child, this is outside the business activities excluded from the policy.

I hold, then, that Krystal's injuries arose out of a business pursuit of an insured and I hold that the injuries did not result from activities ordinarily incident to non-business pursuit.

 Plaintiff is defending the state court lawsuit under a reservation of rights, and defendants in this case claim that the insurance company has waived and it is estopped to assert lack of coverage under the policy. A study of *Harbin v. Insurance Company of America* (1962) 10 Cir. 308 F.2d 748; *Pendleton v. Pan American Fire and Casualty Company* (1963) 10 Cir. 317 F.2d 96; *City of Aurora v. Trinity Universal Insurance Company* (1964) 10 Cir. 326 F.2d 905, and *Gulf Insurance Company v. State of Colorado* (1979) Colo.App., 607 P.2d 1016, convinces me that there is neither waiver nor estoppel. The notification of a reservation of rights was given promptly, and the state court action is pretty much in abeyance awaiting the outcome of this case. No one has been prejudiced by any reliance on the tender of an unqualified defense by plaintiff in this case, and the insurance company has made it abundantly clear that it is questioning policy coverage. This case is not another *Pendleton, supra*; it is clearly within the holding of *City of Aurora, supra*, where Chief Judge Murrah said:

> "... the insurer refused to defend without prejudice to the appellant. When it became apparent to the insurer that there was a coverage problem involved in the state litigation, reservation of right letters were forwarded to the insured. La-

ter, notices of withdrawal and pertinent pleadings then contained in the file were sent to the insured. Clearly, appellant received timely notice of insurer's position and had sufficient time to prepare a defense. There was no prejudicial reliance on the conduct of the insurer ..."

Here, plaintiff is providing representation for the Pipers in the state court action through other counsel, but the reservation of rights has been spelled out, and there is no prejudice to the Pipers. Necessarily, the Ervins cannot have acted to their detriment in reliance on the Piper's insurance, and it is clear that there is no conscious waiver of its rights by the insurance company. See, *Gulf Insurance Company v. State of Colorado, supra.*

The plaintiff is not estopped from claiming non-coverage and it has not waived its right to make this claim. These things being so, I find and conclude that the policy in question does not cover the injuries suffered by Krystal Ervin.

All parties shall pay their own costs.