277 P.3d 905 (2012)
NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, Plaintiff-Appellant,
v.
Larry GARFINKEL; Kane Real Estate & Development, LLLP, a Colorado limited liability limited partnership; Daniel B. Willie; Dessa S. Willie; Moore P. Huffman, Jr.; General Property Mortgage, Inc., a Colorado corporation; Great Northern Insurance Company, a Minnesota corporation; and Ranch at Roaring Fork Homeowners Association, Inc., a Colorado nonprofit corporation, Defendants-Appellees.
No. 11CA0230.
Colorado Court of Appeals, Div. I.
March 15, 2012.
*907 White and Steele, P.C., James M. Dieterich, Chelsey M. Burns, Denver, CO, for Plaintiff-Appellant.
Karp Neu Hanlon, P.C., Sander N. Karp, Glenwood Springs, CO, for Defendant-Appellee Larry Garfinkel.
Cozen O'Connor, Brad W. Breslau, Denver, CO, for Defendants-Appellees Kane Real Estate & Development, LLLP; Daniel B. Willie; Dessa S. Willie; Moore P. Huffman, Jr.; General Property Mortgage, Inc.; and Great Northern Insurance Company.
Purvis Gray, LLP, John A. Purvis, Boulder, CO, for Defendant-Appellee Ranch at Roaring Fork Homeowners Association, Inc.
Opinion by Judge VOGT.[*]
¶ 1 Plaintiff, National Farmers Union Property and Casualty Company (NFU), appeals the trial court's summary judgment in favor of defendants, Larry Garfinkel; Kane Real Estate & Development, LLLP; Daniel B. Willie; Dessa S. Willie; Moore P. Huffman, Jr.; General Property Mortgage, Inc.; Great Northern Insurance Company; and Ranch at Roaring Fork Homeowners Association, Inc. We affirm in part, reverse in part, and remand for further proceedings.

I. Background
¶ 2 In 2008, a wildfire in Garfield County injured defendant Garfinkel and damaged the property of the other defendants. In two lawsuits (the underlying lawsuits), defendants sued Larry Gerbaz and 100 Road Cattle Company LLC (the LLC), alleging generally that Larry Gerbaz was acting individually and as an agent of the LLC when he burned slash piles on the LLC's property, that he was negligent in leaving the fires unattended, and that his negligence caused their losses.
¶ 3 At the time of the fire, NFU had in effect a farm liability insurance policy, with a $1 million liability limit per occurrence, covering the property at 1265 County Road 100, Carbondale, Colorado (the farm property), where the slash burning took place. The LLC was the named insured.
¶ 4 NFU also had in effect a homeowners insurance policy insuring the residence of Larry Gerbaz, which was adjacent to the farm property, with a $500,000 limit per occurrence. *908 Larry Gerbaz was the named insured, and Molly Gerbaz, his wife, also qualified as an insured under the policy.
¶ 5 The underlying lawsuits were settled through NFU's payment of the $1 million liability limit under the farm policy and the parties' agreement to file this action to obtain a judicial determination of whether there also was coverage for defendants' losses under the homeowners policy.
¶ 6 In this action, the parties filed cross-motions for summary judgment on the coverage question. The trial court entered summary judgment for defendants, rejecting NFU's argument that it was not obligated to provide coverage based on two exclusions in the homeowners policy, the "business pursuits" exclusion (precluding coverage for bodily injury or property damage arising out of or in connection with a business engaged in by an insured) and the "owned premises" exclusion (precluding coverage for bodily injury or property damage arising out of a premises owned by an insured that is not an insured location).

II. Standard of Review
¶ 7 Summary judgment is appropriate where the pleadings and supporting documents demonstrate that no genuine issue of material fact exists and that the moving party is entitled to a judgment as a matter of law. C.R.C.P. 56(c); Pierson v. Black Canyon Aggregates, Inc., 48 P.3d 1215, 1218 (Colo.2002). The nonmoving party is entitled to the benefit of all favorable inferences that may be drawn from the undisputed facts, and all doubts are resolved against the moving party. A.C. Excavating v. Yacht Club II Homeowners Ass'n, 114 P.3d 862, 865 (Colo. 2005). We review the trial court's summary judgment de novo. Pierson, 48 P.3d at 1218.
¶ 8 We likewise review de novo the trial court's interpretation of an insurance policy. Hoang v. Assurance Co., 149 P.3d 798, 801 (Colo.2007); Sachs v. Am. Family Mut. Ins. Co., 251 P.3d 543, 545 (Colo.App. 2010). Like other contracts, insurance policies are reviewed with the ultimate aim of effectuating the contracting parties' intentions, and are to be given effect according to the plain and ordinary meaning of their terms. Bailey v. Lincoln Gen. Ins. Co., 255 P.3d 1039, 1050-51 (Colo.2011). If policy provisions are ambiguousthat is, susceptible of more than one reasonable interpretationthey are to be construed against the insurer as the drafter of the policy. Id. at 1051; Sachs, 251 P.3d at 546. However, unambiguous limitations or exclusions in an insurance policy must be enforced. Hoang, 149 P.3d at 801; Sachs, 251 P.3d at 546 (affirming summary judgment for insurer based on owned premises exclusion in homeowners policy).

III. Analysis

A. The Business Pursuits Exclusion
¶ 9 NFU contends that, because the farm property was being leased to third parties for haying and pasturing at the time of the April 2008 wildfire, coverage for defendants' losses was specifically excluded by the business pursuits exclusion in the homeowners policy, and the trial court erred in ruling to the contrary. We conclude that further proceedings are required to resolve this issue.

1. Scope and Applicability of the Exclusion
¶ 10 The intent of homeowners liability policies is to protect the insured against the risk of liability for injuries suffered by others. 9A Lee R. Russ & Thomas F. Segalla, Couch on Insurance § 128.2 (3d ed. 2011). While such policies may provide liability coverage for injuries caused by an insured on premises other than the insured location, they typically exempt from coverage bodily injury or property damage arising out of or in connection with a business engaged in by an insured. Because people characteristically separate their business activities from their personal activities, business pursuits coverage is not essential for their homeowners coverage and is excluded to keep premium rates at a reasonable level. Id. at § 128.12; see Indus. Indem. Co. v. Goettl, 138 Ariz. 315, 674 P.2d 869, 874-75 (1983) (explaining rationale for excluding incomeproducing activities, which present special risks beyond the ordinary risks and hazards inherent in maintaining a home, from personal liability coverage in homeowner policies); *909 Allstate Ins. Co. v. Hallman, 159 S.W.3d 640, 645 (Tex.2005) ("[A]s numerous courts have recognized, the purpose of the business pursuits exclusion is to lower homeowners insurance premiums by removing coverage for activities that are not typically associated with the operation and maintenance of one's home."); see also Bailey, 255 P.3d at 1047 (observing, in a different context, that ability of insurers to limit coverage is "central to the notion of what constitutes insurance" (quoting Aluminum Co. v. Aetna Cas. & Sur. Co., 140 Wash.2d 517, 998 P.2d 856, 878 (2000))).
¶ 11 The NFU policy at issue here includes a business pursuits exclusion. It states:
SECTION IIEXCLUSIONS
1. Coverage EPersonal Liability and Coverage FMedical Payments to Others do not apply to "bodily injury" or "property damage":
. . .
b. Arising out of or in connection with a "business" engaged in by an "insured." This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed or implied to be provided because of the nature of the "business."
The definitions portion of the policy states that "business includes trade, profession or occupation."[1]
¶ 12 This exclusion is identical or similar to exclusions in other homeowners policies. See Couch, § 128:12 (noting that "nearly all the variations employ virtually the same substantive language, including broad exclusionary language for liabilities arising out of `business engaged in by' or `business pursuits' of an insured"); see also Metro. Prop. & Cas. Ins. Co. v. Jablonske, 722 N.W.2d 319, 326 (Minn.Ct.App.2006) (declining to recognize a distinction between an exclusion labeled "business" and an exclusion labeled "business pursuits"). Although the exclusion at issue here does not use the phrase "business pursuits," we will refer to it as a "business pursuits" exclusion, consistent with the case law and the terminology used by the parties in this case.
¶ 13 Exclusions for business pursuits have been the subject of numerous appellate decisions. In Colorado, courts have found business pursuits exclusions to exclude coverage where an insured, seeking liability coverage under his homeowners policy, shot the victim in a business dispute, Bolejack v. Travelers Ins. Co., 64 P.3d 939, 941 (Colo.App.2003), and where the insureds injured children while operating day-care businesses in their homes. See Republic Ins. Co. v. Piper, 517 F.Supp. 1103, 1106-07 (D.Colo.1981); Rodriguez v. Safeco Ins. Co., 821 P.2d 849, 852 (Colo.App.1991).
¶ 14 In none of the three Colorado cases was the particular exclusion at issue found to be ambiguous. In Rodriguez, 821 P.2d at 853, and Republic Ins. Co., 517 F.Supp. at 1107-08, the courts expressly rejected arguments that the business pursuits exclusions in the policies before them were ambiguous. In Bolejack, 64 P.3d at 940-41, whereas in the case before usthe exclusion precluded coverage for bodily injury or property damage "arising out of or in connection with a `business' engaged in by an `insured,'" and defined business as including any "trade, profession, or occupation," the division cited case law requiring enforcement of unambiguous policy exclusions and concluded that the "plain language of the exclusion" applied to preclude coverage for the injury inflicted by the insured. As in these cases, we conclude that the exclusion here, "expressed in plain, certain, and readily understandable language," Rodriguez, 821 P.2d at 853, is unambiguous and accordingly must be enforced as written.
¶ 15 Having concluded that the exclusion itself is not ambiguous, we must next determine whether the particular activity engaged in by the insured constitutes a business pursuit. In Rodriguez, id. at 852, the division *910 adopted a "particular activities" test to determine applicability of the exclusion where the exclusion included an exceptionnot present in NFU's policyfor activities "ordinarily incident to non-business pursuits." However, the Colorado cases have not otherwise addressed the test for determining whether an activity falls within the business pursuits exclusion. See Allstate Ins. Co. v. von Metzger, 774 F.Supp.2d 1157, 1161-62 (D.Colo.2011) (in case involving business exclusion in personal umbrella insurance policy, court was not persuaded by case law from other jurisdictions regarding the test for when an activity is a "business pursuit," noting that there was "no authority suggesting that Colorado courts apply a similar test"). We therefore look to cases from other jurisdictions to inform our analysis.
¶ 16 In determining whether an activity is a business pursuit, the courts generally engage in a two-part inquiry, assessing (1) the continuity or regularity of the activity, and (2) whether there is a profit motive. When an activity evinces both "continuity" and "profit motive," it is a business pursuit within the meaning of the exclusion. Couch, § 128.13; see Goettl, 674 P.2d at 872-75 (same); Pacific Indem. Ins. Co. v. Aetna Cas. & Sur. Co., 240 Conn. 26, 688 A.2d 319, 321-22 (1997) (collecting cases); Hallman, 159 S.W.3d at 643-44 (collecting cases); Williams v. State Farm Fire & Cas. Co., 180 Wis.2d 221, 509 N.W.2d 294, 297-98 (App. 1993) (Williams v. State Farm) (noting that this two-part test is "overwhelmingly followed" in jurisdictions that have addressed the issue); see also Mid-Century Ins. Co. v. Williams, 174 S.W.3d 230, 240 (Tenn.Ct.App. 2005) (having concluded that exclusion was not ambiguous, court next applied two-part inquiry to determine whether activity in question was a business pursuit). While the first element of the test contemplates a continuous or regular activity engaged in by the insured, the majority view is that the activity need not be the insured's sole or even primary occupation. Part-time or supplemental activities may constitute business pursuits for purposes of the exclusion. 7A John Alan Appleman, Insurance Law and Practice § 4501.10, at 271-72 (1979); Couch, § 128:13; see, e.g., State Farm Fire & Cas. Co. v. Drasin, 152 Cal.App.3d 864, 199 Cal.Rptr. 749, 751-52 (1984) (rejecting argument that insured's activities were not excluded because they were not done in his capacity as an attorney; collecting cases); Pacific Indem. Ins. Co., 688 A.2d at 323 (business pursuits exclusion applied even though insureds did not board horses as their sole means of livelihood); Gaynor v. Williams, 366 So.2d 1243, 1243-44 (Fla.Dist.Ct.App. 1979) (insured was a banker, but injury arose out of his ownership of an apartment complex); Mid-American Fire & Cas. Co. v. Shoney's, Inc., 843 N.E.2d 548, 552 (Ind.Ct. App.2006) (insured was employed as a college professor, but his investment in property where contamination occurred was a business pursuit); State Auto Prop. & Cas. Ins. Co. v. Raynolds, 357 S.C. 219, 592 S.E.2d 633, 636 (2004) (rejecting argument by insureds, a retired engineer and an operator of a retail business, that their part-time dog breeding activity was not a business pursuit; collecting cases).
¶ 17 A minority view is that the exclusion should be limited to those activities that constitute an insured's principal occupation. See Hallman, 159 S.W.3d at 644 (citing cases that adopt the minority rule). Like other courts that have considered the issue, see id.; Pacific Indem. Ins. Co., 688 A.2d at 322, we find the majority view more consistent with the language of the policywhich defines "business" with the expansive term "including," thereby contemplating that business is not limited to the "trade, profession or occupation" of the insuredand accordingly apply that view here. Thus, part-time activity or a secondary occupation may satisfy the first element of the two-prong test.
¶ 18 Leasing or renting out property is one type of commercial activity that falls within the definition of a business pursuit. In Hallman, 159 S.W.3d at 644, the court of appeals had held that the business pursuits exclusion did not apply because there was no allegation that leasing her mineral rights was the insured's principal business and because she had entered into only one lease agreement, executed ten years previously. The Texas Supreme Court reversed, finding the business *911 pursuits exclusion applicable where the mining activity conducted pursuant to the lease was ongoing at the time the plaintiffs filed their initial and amended petitions. See also Kessel v. State Auto. Mut. Ins. Co., 871 N.E.2d 335, 340 (Ind.Ct.App.2007) (exclusion applied where insureds leased their barn to owner of dog that caused injury); Couch, § 128.14 ("Generally, the ownership of rental properties constitutes a business pursuit and thus liability arising out of the ownership of such properties is precluded pursuant to the business pursuit exclusion. Further, necessary repairs and maintenance of rental property performed by the owner is considered incidental to the ownership of the property [and] will therefore constitute a business pursuit.").
¶ 19 Leasing real property may be a business pursuit of the insured even if someone else manages the property. See Becker v. State Farm Fire & Cas. Co., 664 F.Supp. 460, 462-63 (N.D.Cal.1987) (insureds' ownership of movie theater, which was to be managed by a third party, was clearly a business pursuit, even if it was a "one-time deal"); Gaynor, 366 So.2d at 1243-44 (business pursuits exclusion applied where insured owned apartment complex that was run through general manager).
¶ 20 Investing can also be a business pursuit even if it is not the insured's primary occupation; however, it may not be if the insured is no more than a passive investor. See Couch, § 128:21 (investing falls within the business pursuits exclusion where there is substantial active involvement by the insured, plus a profit motive, even if the investment activity is only a part-time or secondary occupation; however, mere passive investments are generally held not to constitute business pursuits); compare Becker, 664 F.Supp. at 462-63 (rejecting insureds' argument that they were mere passive investors, noting that they discussed details about theater and brands of equipment with theater's manager), Grossman v. Am. Family Mut. Ins. Co., 461 N.W.2d 489, 496 (Minn.Ct.App. 1990) (limited partners' investment in apartment complex, managed by a third party, was a business pursuit not covered by their homeowners policies), and Williams v. State Farm, 509 N.W.2d at 297 (rejecting argument that investment by insured, a certified public accountant, in apartment complex joint venture was a mere passive investment and finding that it was a business pursuit), with Hoepp v. State Farm Ins. Co., 142 N.H. 189, 697 A.2d 943, 945-46 (1997), and Erie Ins. Exchange v. Szamatowicz, 164 N.C.App. 748, 597 S.E.2d 136, 139 (2004), in which the insureds' minimal involvement in their investments did not implicate the business pursuits exclusion.
¶ 21 Regarding the second, or "profit motive" element of the test, the cases recognize that actual profit is not required as long as the activity in question is one that constitutes a means of procuring subsistence or profit and there is a motive to make a profit or, at a minimum, to cover costs and expenses. Profit need not be an immediate or even primary consideration of the business pursuit. Couch, § 128:13; see Safeco Ins. Co. v. Hilderbrand, 602 F.3d 1159, 1164 (10th Cir.2010) (insureds operated their business with a profit motive, even though no actual profit ever materialized, where their intent was to generate enough income to sustain their animal sanctuary); Pacific Indem. Ins. Co., 688 A.2d at 323 (it was "of no moment" that insureds incurred net losses from their horse boarding activity for two of the years in question, where one insured used income to offset her expenses for her own riding activities); Saha v. Aetna Cas. & Sur. Co., 427 So.2d 316, 317-18 (Fla.Dist.Ct.App.1983) (physician's investment in cattle herd as tax shelter was a business pursuit despite the fact that he received virtually no income from the cattle); Raynolds, 592 S.E.2d at 636 ("[T]he concepts of profit motive and actual profit are not identical and while the [insureds'] overall income from selling or breeding the dogs may not have produced a profit, evidence suggests that they at least had a motive to cover their costs."). Courts often find it relevant that the profit or loss was referenced on tax returns. See Hilderbrand, 602 F.3d at 1165; Republic Ins. Co., 517 F.Supp. at 1106; Saha, 427 So.2d at 318.
¶ 22 "The business pursuit exclusion is intended to apply to all activities that are involved in furtherance of any business, employment, *912 trade, occupation or profession." Appleman, § 4501.10, at 276-77. If the activity is determined to be a business pursuit upon application of the two-part test discussed above, the exclusion will apply whenever the insured is furthering his or her own business interests or the business interests of another, even if the insured does not receive any remuneration for the service. Id., § 4501. 10, at 275-76; see Cardinal v. Long Island Power Auth., 309 F.Supp.2d 376, 392 (E.D.N.Y.2004) (business pursuits exclusion applied where property owner's father and another individual, working in exchange for reduction in his rent, were disposing of tree limbs and branches in preparation for a prospective tenant); Erickson v. Christie, 622 N.W.2d 138, 140-41 (Minn.Ct.App.2001) (exclusion applied where injury was caused by twelve-year-old boy helping in his father's farming occupation).

2. Application to this Case
¶ 23 In the trial court, both sides sought summary judgment based on deposition excerpts and documents that established the following facts relevant to the issue presented here.
¶ 24 In 1999, Molly Gerbaz and her family decided to buy the farm property to serve as a buffer between their residence and encroaching development. Their attorney, Thomas Polachek, testified at his deposition that they decided to have the property held by an LLC to facilitate administration and for liability protection. The 100 Road Cattle Company LLC was established for the purpose of acquiring the property. Molly Gerbaz owns a one-third interest in the LLC, a trust for her benefit owns another one-third, and trusts for the benefit of the Gerbaz children own the remaining third.
¶ 25 The LLC received rental income from the farm property, its sole asset. The previous owner, Dennis Gerbaz, leased the residence on the property until he died in 2007; thereafter, a caretaker lived on the premises in exchange for doing chores on the property, but he paid no rent. In addition, the agricultural fields were leased to Paul, Ted, and Tim Nieslanik for haying and pasturing. The record includes a written, eleven-month lease dated February 2000, showing the LLC as the landlord and the Nieslaniks as the tenants. The original rent was $1000 per year. The LLC's 2008 tax return shows that it received $1200 in "rental real estate income" that year. There are no other written leases in the record, nor is there a reference to rental income on the LLC's 2004-2007 tax returns. Thomas Polachek testified that, although no other written lease was signed, "[w]e just let it roll over" after the original lease term expired, and Larry Gerbaz testified that the Nieslanik lease had been entered into by Dennis Gerbaz and "still continues."
¶ 26 Although Thomas Polachek manages the LLC, both Molly Gerbaz and Larry Gerbaz have had significant involvement with the farm property. They made the decision to acquire the property and to let the current caretaker live there without paying rent. Molly Gerbaz testified that she had the authority to make decisions on behalf of the LLC and write checks on its account. On one occasion, she persuaded Polachek to "back off" from raising the rent. Larry Gerbaz testified that he had performed maintenance on the property since his retirement in February 2008, either doing the work himself or arranging for others to do it. He was reimbursed for his expenses but did the work for free because the property "belongs to the family and it needs to be done."
¶ 27 The incident that was alleged to have caused the wildfire took place in April 2008. Larry Gerbaz and the caretaker were burning piles of brush. According to Larry's deposition testimony, this was part of the cleanup work he had undertaken to prepare the property for the Nieslaniks' lease activities.[2]
¶ 28 On these facts, NFU argued in the trial court that the business pursuits exclusion applied for two reasons: (1) In burning *913 slash piles on the farm property, Larry Gerbaz (the insured under the homeowners policy) was performing activities in furtherance of a business pursuit, which was the preparation of the farm property for pasturing by the Nieslaniks; and (2) Molly Gerbaz, who also qualified as an insured under the homeowners policy, would receive income from the Nieslaniks' activities as a member of the LLC that owned the property. Thus, according to NFU, the claims in the underlying lawsuits arose from a business pursuit engaged in by an insured, and NFU therefore had no obligation under the Gerbaz homeowners policy to indemnify defendants for their losses.
¶ 29 The trial court concluded that the business pursuits exclusion did not apply. It agreed with defendants that Larry Gerbaz was not engaged in business because he had previously been employed in other occupations and did not begin maintaining the farm property until after he retired in 2008; did only occasional, voluntary maintenance work on the property; was not and did not expect to be paid for his work; and was not an employee of the LLC. It further concluded that the LLC's leasing of the property to the Nieslaniks did not show a profit motive, noting that the farm was originally purchased as a buffer against increasing development, the 2000 written lease was not renewed, the lease did not generate income or profit for the LLC, there was no record of rental payments from the Nieslaniks in 2004-2007, and the lease payments failed to cover the cost of maintaining the property. Thus, the court concluded, if the LLC was not engaged in business "then there was no `business' for Molly Gerbaz to be engaged in vis-à-vis the LLC," and Molly's involvement was in any event not shown to be adequately consistent and profit-driven.
¶ 30 In so concluding, the trial court did not have the benefit of the analysis and the authorities discussed above. Under these authorities, the business pursuits exclusion could apply despite the existence of certain facts relied on by the trial court in support of a contrary conclusionnamely, facts showing that (1) maintenance of the farm property was not Larry Gerbaz's primary occupation; (2) Larry Gerbaz was not paid for his work and was not an employee of the LLC; (3) the farm was originally purchased for a purpose other than generating rental income; and (4) the income derived from the Nieslanik lease was insufficient to cover expenses or generate an actual profit for the LLC. Nor was the apparent nonrenewal of the 2000 written leasecited by the trial courtdispositive of whether the leasing activity could be deemed continuous. See Hallman, 159 S.W.3d at 645; see also First Interstate Bank v. Tanktech, Inc., 864 P.2d 116, 120 (Colo.1993) (once lease expires and tenant remains in possession, landlord may elect to continue the tenancy; acceptance of rent following expiration of lease creates a holdover tenancy).
¶ 31 On the contrary, if the continuity and profit motive elements of the "business pursuits" test are present, Larry Gerbaz's burning of slash piles on the farm property in April 2008 would amount to an activity in furtherance of a business pursuit. See Cardinal, 309 F.Supp.2d at 392; Couch, § 128:15.
¶ 32 Further, Molly Gerbazalso an insured under the homeowners policywould have engaged in this business pursuit through her status as a member and owner of the LLC. Under the terms of the LLC's operating agreement and under Colorado law, see §§ 7-80-503, 7-80-504, C.R.S.2011, she was entitled to her share of the LLC's profits and to an allocation of its losses. More important, as evidenced by the facts set forth above that show her active involvement in decision-making and management of the farm property, Molly Gerbaz was more than a mere "passive investor" in the LLC.
¶ 33 Contrary to defendants' argument, no different conclusion is warranted based on the fact that the LLC, not Molly Gerbaz, was the title owner of the farm property and the landlord on the lease. An insured may be found to have engaged in a business pursuit, for purposes of this exclusion, through a business entity. In Grain Dealers Mutual Insurance Co. v. Farmers Alliance Mutual Insurance Co., 298 F.3d 1178, 1182 (10th Cir.2002), the Tenth Circuit rejected the insureds' argument that the business pursuits exclusion was inapplicable *914 because it was their company, and not they personally, that operated the business which damaged the adjacent landowners' property. The court held that, even assuming the insureds were entitled to the protective benefit of the corporate form they chose, their personal involvement in the company's operations sufficed to implicate the business pursuits exclusion in their homeowners policy. See also Sun Alliance Ins. Co. of Puerto Rico, Inc. v. Soto, 836 F.2d 834, 835 (3d Cir.1988) (rejecting insureds' argument that, because they were the named insureds under their homeowners policy but the property where the liability-causing fire occurred was owned by their corporation, the business pursuits exclusion was inapplicable); Becker, 664 F.Supp. at 462-63; Williams v. State Farm, 509 N.W.2d at 297; Grossman, 461 N.W.2d at 496.
¶ 34 While many of the facts cited by the trial court thus do not preclude applicability of the business pursuits exclusion, we cannot say as a matter of law, based on the record before us, that the exclusion applies in this case. Rather, we conclude that disputed issues of material fact remain as to whether the leasing activity on the farm property evinced the continuity and profit motive necessary to constitute a business pursuit. See Appleman, § 4501.10, at 273 ("Whether an activity is a business pursuit is almost always a factual question presented for the determination by a court.").
¶ 35 Specifically, given the lack of clarity in the deposition testimony and the absence of a reference to rental income on the LLC's 2004-2007 tax returns, it is unclear whether the Nieslanik leasing activity was in fact continuing during those years, and, if it was, whether the LLC received rent or some nonmonetary compensation for allowing the Nieslaniks to continue to use the property for haying and pasturing. Also, except for Thomas Polachek's deposition testimony that "we expected to be paid for the use of the property"testimony which, at a minimum, is subject to conflicting inferencesthere is no evidence in the record of the LLC's intent or purpose in entering into the lease.
¶ 36 A break in the leasing activity or a period without payment of rent, while not necessarily dispositive, would be relevant to determining whether the activity was continuous. Nor would lack of an intent to make a profit be dispositive of the "profit motive" element, as long as there was at least an intent to make enough money to offset costs or expenses incurred by the LLC in maintaining the property. However, the continuity and profit motive inquiries raise issues of material fact that cannot be decided on summary judgment but must instead be left to the finder of fact. See C.R.C.P. 56(c); Churchey v. Adolph Coors Co., 759 P.2d 1336, 1342 (Colo.1988) (where there are factual disputes in the record and varying inferences that can be drawn from those facts, summary judgment may not enter and issue in dispute must be left for jury to decide).
¶ 37 We therefore reverse the summary judgment finding the business pursuits exclusion inapplicable. We remand the case for trial on the issue of whether, based on the facts as found by the fact finder and under the legal principles set forth here, the business pursuits exclusion in NFU's policy precludes coverage for defendants' losses.

B. The "Owned Premises" Exclusion
¶ 38 NFU's homeowners policy also excludes coverage for bodily injury or property damage "[a]rising out of a premises ... [o]wned by an `Insured' ... that is not an `insured location.'" The trial court found this exclusion inapplicable because the property where the slash burning took place was not owned by an insured but by the LLC. In challenging this conclusion on appeal, NFU points out that Molly Gerbaz was an owner of the LLC and argues that "ownership through a corporate entity is still ownership."
¶ 39 As discussed above, an insured may be deemed to have engaged in a business pursuit though a business entity if she had sufficient personal involvement in the entity's operations. However, we conclude that, for purposes of NFU's owned premises exclusion, the owner is the entity that holds title to the propertyhere, the LLC. We thus affirm the trial court's ruling that the owned premises exclusion does not preclude coverage in this case.

*915 1. Case Law and Other Authority
¶ 40 Like the business pursuits exclusion, this "owned premises" exclusion or similarly worded exclusions are common in homeowners policies. In Sachs, which addressed a policy provision similar but not identical to NFU's owned premises exclusion, a division of this court explained the purpose of such provisions:
The ... exclusion ... is intended to preclude from coverage injuries or property damage arising out of property that is owned by the insured, but unlisted in the policy. The reason for the exclusion is that the unlisted property and the risks associated with it have not been included in the underwriting consideration or the determination of the cost of the policy.
Sachs, 251 P.3d at 543 (quoting Wickner v. Am. Reliance Ins. Co., 141 N.J. 392, 661 A.2d 1256, 1258 (1995)); see also Maroney v. New York Central Mut. Fire Ins. Co., 5 N.Y.3d 467, 805 N.Y.S.2d 533, 839 N.E.2d 886, 888 (2005) ("An insurer does not wish to be liable for losses arising from risks associated with a premises for which the insurer has not evaluated the risk and received a premium....").
¶ 41 Although owned premises exclusions have been the subject of much litigation, there are relatively few cases addressing the only issue raised by the parties in this case: namely, whether an insured may be deemed to "own" the uninsured premises when a business entity in which she has an interest is the title owner. While both parties refer us to definitions of ownership used in other contexts, we find these definitions unhelpful in resolving the issue before us, and we thus look in the first instance to authority addressing ownership in the context of insurance policies.
¶ 42 Couch explains that there are
many circumstances under which an insured's interest in property is such as to raise questions about whether the insured can be said to "own" it. For example, a dealer who receives goods on consignment does not "own" them within the meaning of such an exclusion, nor does a shareholder in a corporation, even a majority shareholder, "own" property held in the corporation's name.

Couch, § 126:17 (emphasis added; footnote omitted).
¶ 43 The authorities cited by Couch for the latter proposition do not address an owned premises exclusion like that in NFU's policy. The few cases we have found that deal with ownership in the context of that specific exclusion have concluded that the uninsured property is owned by the record title owner, not by others who may have an ownership interest in it. In State Farm Lloyds v. Goss, 109 F.Supp.2d 574, 578 (E.D.Tex.2000), which involved the same exclusion as that found in NFU's policy, the court found that the term "owned" was "indeed susceptible [of] only one reasonable definition," and that the insured who still held legal title to the uninsured property "owned" the property even though he had entered into a contract to sell it. In State v. Dennin, 39 A.D.3d 925, 834 N.Y.S.2d 348, 350 (N.Y.App.Div.2007), the court similarly concluded that, "[a]lthough the policy does not define `owned,' giving the word its ordinary meaning results in no other conclusion than that defendant [who held title to the property] was the owner of the convenience store/gas station" (citation omitted). See also Wraight v. Estate of Neu, 186 A.D.2d 1026, 588 N.Y.S.2d 679, 680 (N.Y.App. Div.1992) (concluding that, under similar exclusion, insured who held title to the property "owned" it even though he held title subject to the rights of option holders).
¶ 44 Additionally, NFU's owned premises exclusion differs from that in policies that exclude coverage for uninsured premises "owned, rented, or controlled" by an insured. Inclusion of the term "controlled" in the exclusion has led some courts to conclude that the exclusion bars coverage where an insured has less than full ownership of the premises in question. See Christian v. Progressive Cas. Ins. Co., 57 S.W.3d 400, 403-04 (Mo.Ct. App.2001) (applying exclusion for bodily injury occurring on uninsured premises "owned, rented or controlled" by insured, where insured had control over the area around his trailer even though the property was titled in the name of another); Sinopoli v. North River Ins. Co., 244 N.J.Super. 245, 581 A.2d 1368, 1371-72 (N.J.Super.Ct.App.Div.1990) *916 (exclusion applied where, although title to uninsured premises was in their corporation, insureds controlled the corporation through their stock ownership).
¶ 45 In light of these authorities, and consistent with the principle that any ambiguities in policy exclusions are to be construed against the insurer, see Bailey, 255 P.3d at 1050-51, we conclude that an exclusion for uninsured premises "owned"not owned or "controlled"by an insured applies only where the insured is the title owner of the property. It does not apply to a situation where title to the property is held by an entity in which an insured has an interest, even a controlling interest.

2. Application to this Case
¶ 46 Here, it is undisputed that the LLC held title to the farm property where the slash burning occurred. Although Molly Gerbaz was an owner of the LLC, the LLC remained a separate legal entity. See In re Phillips, 139 P.3d 639, 643 (Colo.2006).[3] In these circumstances, the NFU policy exclusion barring coverage for injuries and damage arising out of uninsured premises "owned" by an insured does not apply.

IV. Conclusion
¶ 47 The judgment is affirmed to the extent it concludes that NFU's owned premises exclusion did not preclude coverage under the homeowners policy. The judgment is otherwise reversed, and the case is remanded for further proceedings in accordance with the views set forth here.
Judge TAUBMAN and Judge DAILEY concur.
NOTES
[*] Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S.2011.
[1] NFU's farm policy, which covered the farm property where the slash burning occurred, also excluded coverage for business pursuits. However, unlike the homeowners policy, the farm policy expressly excepted "farming" from the definition of "business." Therefore, the exclusion did not apply, and NFU paid defendants the $1 million policy limit under this policy.
[2] In the underlying lawsuits, the plaintiffs alleged, in one complaint, that Larry Gerbaz was acting as the LLC's "representative, agent, employee, or otherwise." In the other complaint, it was alleged that he was acting "for and on behalf of the LLC." Defendants admitted these allegations.
[3] Although Colorado law recognizes situations in which the corporate veil may be pierced and applies that concept to LLCs, see § 7-80-107(1), C.R.S.2011; Sheffield Services Co. v. Trowbridge, 211 P.3d 714, 720 (Colo.App.2009), NFU has not argued that the doctrine of piercing the corporate veil should be applied here. We therefore do not address the potential applicability of that doctrine to the issue before us.